IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HELLS CANYON PRESERVATION
COUNCIL, EARTHWORKS, and                         CV. 05-1057-PK
NORTHWEST ENVIRONMENTAL
DEFENSE CENTER,                                   OPINION AND
               Plaintiffs,                         ORDER

v.

RICHARD J. HAINES, STEVE ELLIS,
and UNITED STATES FOREST SERVICE,
              Defendants.

PAPAK, Magistrate Judge:

      Plaintiffs challenge the Record of Decision (ROD) for the North Fork Burnt River

Mining Project (Project) in the Wallowa-Whitman National Forest (WWNF) in Eastern Oregon.

Plaintiffs allege the U.S. Forest Service (Forest Service) violated the National Forest

Management Act (NFMA), 16 U.S.C. §§ 1600 et seq., the National Environmental Policy Act

(NEPA), 42  U.S.C. §§ 4321 et seq., the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq., the

Forest Service Organic Administration Act of 1897 (Organic Act), 16 U.S.C. § 478, 551, and the

Page 1 - OPINION AND ORDER

Administrative Procedures Act (APA), 5 U.S.C. §§ 501-701.[1]  This court has jurisdiction under 28 U.S.C. § 1331.

On April 7, 2004, the Forest Service issued the Record of Decision selecting Alternative 4 from the Final Environmental Impact Statement (FEIS) for this Project.  Plaintiffs filed an administrative appeal with the Forest Service, and notified the Forest Service of their intent to sue in a 60-day notice letter as required under the CWA.  Plaintiffs filed their complaint with this court on July 7, 2005, and moved for summary judgment on January 27, 2006.  Defendants filed a cross-motion for summary judgment.  Oral argument was held on May 1, 2006.  For the reasons set forth below, plaintiffs' motion for summary judgment is granted as to claims under the Clean Water Act, the Organic Act and the National Forest Management Act.  Defendants' motion for summary judgment is granted as to claims under the National Environmental Policy Act.

LEGAL STANDARD

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); <u>Bahn v. NME Hosp's, Inc</u>., 929 F.2d 1404, 1409 (9th Cir. 1991).

Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the APA, 5 U.S.C. § 706.  <u>Native Ecosystems Council v. U.S. Forest Service</u>, 428 F.3d 1233, 1238 (9th Cir.

---

[1]Defendants Richard Haines and Steve Ellis are sued in their official capacity as a WWNF unit ranger and WWNF forest supervisor.  For clarity, defendants will be referred to as the Forest Service.

2005) (citing Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1065-1067 (9th Cir.

2002)).  Plaintiffs' claims under the Organic Act and § 313 of the CWA are also governed by the

APA.  Under the APA, a court may set aside an agency decision if it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An

agency's action is arbitrary and capricious "if the agency fails to consider an important aspect of

the problem, if the agency offers an explanation that is contrary to the evidence, . . . or if the

agency's decision is contrary to the governing law."  Lands Council v. Powell, 395 F.3d 1019,

1026 (9th Cir. 2005).

Review under this standard is to be searching and careful, but remains narrow, and a

court should not substitute its judgment for that of the agency.  Mt. Graham Red Squirrel v.

Espy, 986 F.2d 1568, 1571 (9th Cir. 1993) (citing Marsh v. Oregon Natural Resources Council,

490 U.S. 360, 378 (1989)).  Deference to an agency's technical expertise and experience is

particularly warranted with respect to questions involving scientific matters.  United States v.

Alpine Land and Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989), cert. denied, 498 U.S. 817

(1990).

Plaintiffs' claim under CWA § 401 arises under the citizen suit provision of the CWA,

and not the APA.  33 U.S.C. § 1365(a)(1).  Under CWA § 401, an agency that issues a permit

without proper certification is in violation of the certification requirement and therefore in

violation of the CWA.  33 U.S.C. § 1341; Oregon Natural Desert Ass'n v. Dombeck, 172 F.3d

1092, 1095 (9th Cir. 1998).

## FACTUAL BACKGROUND

The North Fork Burnt River (NFBR) watershed is located in the Blue Mountains of

Eastern Oregon in the Wallowa-Whitman National Forest (WWNF). Gold mining in the area began in the 1860s and has continued with some gaps to the present. Miners are required, under the Forest Service's mining regulations, to submit a Plan of Operations (PoO) for agency review and approval prior to conducting certain mining operations on federal lands. At the time the ROD was issued, 34 mining PoOs had been approved. Some were approved in the early 1980s and many have no expiration dates. The parties dispute whether 15 additional mining operations will be approved and begin operations based on provisions in the ROD.

Five streams in the watershed have been listed as water-quality impaired under § 303(d) of the Clean Water Act due to high temperatures and/or sedimentation. Three of these streams are involved in this matter in that nineteen projects detailed in the ROD are or will be located on these three streams. The ROD identifies the following activities as negatively affecting water quality in the watershed: timber harvest, road building, and mining. Redband trout, Columbia spotted frog[2] and three plant species that exist in the area are all on the Regional Forester's list of sensitive species. There are 747 miles of road–some open, some closed–in the watershed, mostly built to serve mining operations. The NFBR Roads Analysis identified 241 of these miles as contributors to water quality problems. Road densities throughout the NFBR watershed exceed road density limitations established in the Forest Plan. If all 49 projects in the FEIS are approved, the mining operations will disturb 116 acres in the WWNF, 64 of them in riparian areas.

The mining operations in question include placer mining, suction dredge mining, and lode mining. Typical placer mining operations pass gravel, sand and other substrate over a

---

[2]The Columbia spotted frog is also a candidate for the Endangered Species List.

gravity-separation device called a sluice box and, by running water over the gold-bearing dirt,

separate gold and other heavy metals from gravel known as overburden.  Suction dredge mining

vacuums silt, sand and small gravels from the streambed, passes the gravel and other materials

through a dredge machine in order to filter out the gold, and then discharges gravel, sand and silt

back into the river.  Lode mining extracts minerals from a lode, vein, ledge or other rock in place

between walls or boundaries.  Some mining operations take place within the streambeds

themselves.

On April 7, 2004, the Forest Service issued the ROD.  The purpose and need for the

Project is to address:  1) the unforseen and changed conditions in the NFBR watershed that did

not exist or were not recognized at the time approvals were granted to the currently approved

PoOs; 2) the submission of amendments to some these existing PoOs; 3) submission of several

new proposed PoOs; 4) the Forest Service's responsibility to approve or require modifications to

these existing and proposed PoOs in accordance with federal mining and environmental laws;

and 5) the concern that several reaches of the North Fork Burnt River and its tributaries do not

meet state water quality standards for temperature and sediment.  AR 07936; ROD at 1.  Those

reaches are listed as impaired under § 303(d) of the CWA, placing responsibility on the Forest

Service to address the impaired waterways and develop strategies that will improve water

quality.  The NFBR Roads Analysis indicates that roads are a primary contributor to water

quality degradation.  The FEIS was prepared to disclose cumulative environmental impacts and

determine possibilities for mitigating those impacts resulting from mining activities.

The Forest Service prepared a single FEIS to establish the requirements for all 49 mining

operations at issue.  Plaintiffs allege that the Forest Service thereby "authorized" 49 Plans of

Operations in a single document, the ROD.  The Forest Service states that individual PoOs must

be approved under the agency's mining regulations but admits that, so long as the PoOs conform

to the requirements established in the FEIS and the ROD, the PoOs will be approved.  Since

issuing the ROD, the Forest Service has approved at least 29 PoOs.  None of the operators of the

29 mining projects applied to the state Department of Environmental Quality (DEQ) for § 401

certification under the Clean Water Act.

ANALYSIS

I.    Clean Water Act

The CWA establishes a comprehensive program "to restore and maintain the chemical,

physical, and biological integrity of the Nation's waters"  by reducing and eventually eliminating

the discharge of pollutants into those waters.  33 U.S.C. § 1251(a).  The CWA program includes

a complex regulatory scheme of permits, technology controls, and water quality-based pollution

controls.

The CWA prohibits all discharges of pollutants from point sources into navigable waters,

unless such discharges are authorized pursuant to a CWA permit.  33 U.S.C. § 1311(a).  A point

source is any "discernable, confined, and discrete conveyance."  33 U.S.C. § 1362(14).  The

CWA regulates point source discharges through the section 402 National Pollutant Discharge

Elimination System (NPDES) permit program, which applies to the discharges of pollutants, and

through the section 404 permit program for dredge and fill activities.  33 U.S.C. §§ 1342, 1344.

States are responsible for developing water quality standards to protect the desired

conditions of each waterway within the state's regulatory jurisdiction.  33 U.S.C. § 1313(c).  A

water quality standard includes three elements:  1) one or more designated uses, such as fish

propagation; 2) numeric and narrative criteria specifying the water quality condition necessary to protect the designated uses; and 3) an antidegradation policy that ensures that uses are protected and that high quality waters will be maintained and protected.  33 U.S.C. § 1313(c)(2), 1313(d)(4)(B); 40 C.F.R. §§ 131.6, 131.10-12.  Waterbodies that do not meet water quality standards are deemed "water quality-limited" and placed on the CWA's § 303(d) list.  States must develop total maximum daily loads (TMDLs) for all § 303(d)-listed waterbodies in order to bring them back into compliance with applicable water quality standards.  In Oregon, § 303(d)-listed waterways are subject to the state's antidegradation policy which prevents new or increased pollution and further degradation of water quality.  OAR 340-041-0004(1), (7).

A.    CWA § 401

Section 401 provides:  "Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the applicable provisions of [the Clean Water Act]."  33 U.S.C. § 1341(a)(1).  Federal agencies are thereby prohibited from issuing federal licenses or permits until applicants have obtained certification from the state that discharges resulting from federally permitted activities will conform to the CWA's permitting and water quality requirements.  Id.

Plaintiffs argue that the Forest Service violated the CWA when it authorized Plans of Operations without first requiring the applicants for those PoOs to obtain § 401 certifications.  Plaintiffs contend that approval of a PoO amounts to a federal license or permit to conduct mining activities, and that mining operations may result in discharges into navigable waters, thus

triggering a need for § 401 certification.  The Forest Service argues that the challenged ROD is neither a license nor a permit because there are significant steps that will occur between the issuance of the ROD and final approval of a PoO by the Forest Service, at which time the miner may commence operations.  However, the Forest Service does not dispute that 29 of the PoOs detailed in the ROD have been approved by the Forest Service and that no § 401 certifications were required prior to those approvals.  The Forest Service does not dispute that mining activities may result in discharges into navigable waters.[3]

While the Forest Service disputes whether the ROD is a license or permit that would trigger § 401, it is undisputed that the Forest Service has approved and will continue to approve PoOs without first requiring applicants to receive § 401 certification from the State of Oregon. AR 8365.  Section 401 intends state certification to precede approval of a discharge-causing activity by a federal agency.  California Trout, Inc. v. FERC, 313 F.3d 1131, 1138 (9th Cir. 2002), cert. denied, 540 U.S. 818 (2003); Natural Resources Def. Council v. U.S. EPA, 279 F.3d 1180, 1183 (9th Cir. 2002); Ackels v. U.S. EPA, 7 F.3d 862, 865-67 (9th Cir. 1993).  The agency's responsibility under the CWA is clear and, as here, the Forest Service has not complied with the § 401 requirement of certification prior to permitting miners to begin mining operations.  See 33 U.S.C. § 1341(a)(1) ("No license or permit shall be granted until the certification required by this section has been obtained[.]").  Regardless of how the permit or licensing process is defined, the record shows, and the Forest Service admitted at oral argument, that it has not and will not

---

[3]In its reply brief, the Forest Service's contends numerous factual issues exist regarding whether activities identified in the PoOs "will or could" result in discharges to waters of the U.S. Defendant's reply at 1-2.  However, the relevant inquiry is whether the activities "may" result in discharges to waters of the U.S. and plaintiffs provide sufficient factual support that the mining activities in question may result in such discharges.  Plaintiffs' memo at 17-21.

require § 401 certification prior to final approval of PoOs.  Thus, mining activities that may

result in discharges of pollutants into navigable waters will commence without § 401

certification, a violation of the CWA.  Plaintiffs' motion for summary judgment on the issue of

§ 401 certification is granted.

      B.     CWA § 313

     Section 313 requires all federal agencies to comply with water quality standards,

including a state's antidegradation policy.  33 U.S.C. § 1323(a).  Federal agencies must ensure

that any authorized activity on federal lands complies with all applicable water quality standards.

See Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1153 (9th Cir. 1998); National Wildlife

Federation v. U.S. Army Corps of Engineers, 384 F.3d 1163, 1167 (9th Cir. 2004).

     Plaintiffs argue that by using the ROD and the FEIS to describe substantive requirements

that each PoO would need to incorporate to receive agency approval, the ROD violates § 313

because it fails to include provisions sufficient to ensure compliance with state water quality

standards.  The Forest Service argues that the mining projects will maintain water quality and not

degrade existing beneficial uses of the waterways.  Plaintiffs point to the fact that the Forest

Service has approved additional mining operations in waters that are on Oregon's § 303(d) list as

water-quality limited for sedimentation, and that Oregon's antidegradation policy does not allow

further degradation through new or increased discharges.  OAR 340-041-004(7).[4]  The FEIS

provides sufficient evidence that the mining operations in question will result in discharges to

waterways.  The Forest Service does not dispute plaintiffs' assertion that discharges will result

_____

     [4]Three § 303(d) listed streams are involved in this matter.  Total maximum daily loads
(TMDLs) have not been established for these streams.

Page 9 - OPINION AND ORDER

from the mining operations.

According to the FEIS, mining activities have heavily impacted § 303(d)-listed streams and are a  primary cause of the listings, based on a correlation between sediment production and historic mining activities.  AR 08121, 08132-34.  However, the Forest Service contends that some additional sediment reaching these streams does not violate Oregon law as long as there is no further degradation of water quality.  While the Forest Service points to references in the FEIS that address water quality concerns, its reassurances fall flat based on the history of mining's effects on the streams in question, and the admission in the FEIS that mining operations could contribute to fish habitat degradation in downstream fish-bearing reaches.  AR 08144; FEIS III-64.  Based on the extreme degradation already present in these water quality-impaired stream segments, filtering buffers, silt fences and stream buffers may not provide adequate protection from significant, new sediment loads.  For that matter, the Forest Service acknowledges that several mining-related activities will contribute sediment to the waterways within riparian areas, e.g. stream crossings, check dams, and roads.  Specifically, the Forest Service admits that suction dredging causes discharges to streams.  See Def's Reponse to Pl's CSF ¶ 11.  This court cannot find support in the record for the Forest Service's position that implementation of the requirements to the PoOs as outlined in Alternative 4 of the ROD will protect water quality and result in no measurable increase in sedimentation. This court finds the Forest Service's decision to allow new mining operations on § 303(d)-listed streams arbitrary and capricious.

The Forest Service argues that Alternative 4's contemplation of road closures and decommissionings will reduce road-related sedimentation and improve water quality.

Alternative 4 proposes the following activities to forest system roads recognized as contributing to water degradation:  closing approximately 63 miles of roads currently used for mining access, maintenance on approximately 15 miles of roads, reconstructing approximately 24 miles of roads, and decommissioning approximately 11 miles of roads.  AR 8057; FEIS II-39.  Roads are the largest contributor of activity-generated sediment in the watershed.  AR 7950; ROD at 15.

The Forest Service contends that road-related sediment reduction activities will likely compensate for whatever sediment escapes as a result of mining activities.  This court disagrees and notes the prospective nature of the road-related projects.  The FEIS states that most road closures and decommissionings will not occur until roads are no longer need for mining.  The timing of those projects is, at best, uncertain.  Mining, once started, may continue for many years.  Also, while the Forest Service had some funding available for some road-related activities at the time the ROD was signed, it is unclear when the balance of the funding would become available.  AR 07953; ROD at 18.  Finally, the dispute as to whether the road-related activities can compensate for degradation attributed to mining activities is a question this court need not resolve in that the Forest Service does not submit that the road-related activities bring mining activities into compliance with Oregon law.  Def's Memo at 19 (describing road-related sediment reductions as "icing on the cake").  Because this court finds that Alternative 4 will not comply with Oregon's water quality standards and thus the Clean Water Act, plaintiffs' motion for summary judgment based on the Forest Service's violation of § 313 is granted.

C.    Conclusion

As noted above, part of the purpose and need for the Project at issue here is to address the fact that several reaches of the North Fork Burnt River and its tributaries do not meet state water

quality standards for temperature and sediment.  AR 7936; ROD at 1.  The Forest Service may

not ignore or defer its responsibility to remedy existing water pollution in the project area based

on a misguided notion that the right to mine trumps federal and state environmental laws.  For

the foregoing reasons, plaintiffs' motion for summary judgment on claims under the Clean Water

Act is granted.

II.        The Organic Act

The Forest Service Organic Administration Act of 1897 (the Organic Act) established the

national forest system.  The Organic Act authorizes the Forest Service to promulgate regulations

for the use and preservation of national forests,[5] and  specifies that individuals entering the

national forests for the purpose of exploiting mineral resources "must comply with the rules and

regulations covering such national forests."  16 U.S.C. § 478; Clouser v. Espy, 42 F.3d 1522,

1529 (9th Cir. 1994), cert. denied, 515 U.S. 1141 (1995).  Forest Service mining regulations

require mine operators to comply with all applicable federal and state water quality standards,

including those issued pursuant to the Clean Water Act.  36 C.F.R. § 228.8(b).  Also, all mining

operations shall be conducted so as, where feasible, to minimize adverse environmental impacts

on National Forest resources.  36 C.F.R. § 228.8. While mining in national forests is governed by

the General Mining Act of 1872, "where mining activity disturbs national forest lands, Forest

Service regulation is proper."  Clouser, 42 F.3d at 1529 (citing United States v. Weiss, 642 F.2d

296, 298 (9th Cir. 1981)).

To the extent that this court finds a violation of the Clean Water Act, a finding that the

Organic Act has been violated follows.  This court does not believe the law supports the Forest

_____

[5]16 U.S.C. § 551.

Service's concession of authority to miners under the General Mining Act in derogation of environmental laws and regulations. While some tension exists between an individual's right to mine and the Forest Service's responsibility to safeguard public land, "[t]he Secretary of Agriculture has been given the responsibility and the power to maintain and protect our national forests and the lands therein. While prospecting, locating and developing of mineral resources in the national forests may not be prohibited . . ., the Secretary may adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of placer claims for mining purposes." Weiss, 642 F.2d at 299. The Forest Service has failed to minimize adverse environmental impacts as required by regulations, and failed to ensure that mining operators comply with water quality standards. Plaintiffs' motion for summary judgment on their Organic Act claim is granted.

III.    The National Forest Management Act (NFMA)

NFMA establishes the legal framework for managing Forest Service lands, including the requirement that a land and resource management plan (LRMP or Forest Plan) be prepared by the Forest Service for each national forest, and that all permits, contracts and other usages of land be consistent with the Forest Plan. 16 U.S.C. § 1600 et seq.; 16 U.S.C. § 1604(a) and (i). The Forest Plan for the WWNF was adopted in 1990 and amended in 1995 to provide additional protections for inland native fish as required by the Inland Native Fish Strategy (INFISH). INFISH creates buffer zones in riparian habitat conservation areas (RHCAs), and establishes specific standards and guidelines for minerals managment. INFISH MM-1[6] through MM-6.

Plaintiffs argue that the Forest Service's authorization of mining operations for the NFBR

_____

[6]"MM" is the abbreviation for "minerals management" in INFISH.

Page 13 - OPINION AND ORDER

Project is not consistent with the standards and guidelines of the Forest Plan, specifically

INFISH standard MM-1, MM-2, and with Forest Plan open-road density standards.

    A.    INFISH Standard MM-1

    Plaintiffs argue that some measures adopted by the Forest Service in the ROD to protect

fish and wildlife habitat are inadequate to ensure consistency with standard MM-1.  Standard

MM-1 requires minimization of adverse impacts to inland fish from mineral operations.  For

mining operations in RHCAs, operators must take all practicable measures to maintain, protect

and rehabilitate fish and wildlife habitat that may be affected by the operations.  INFISH

Standard MM-1; AR 02298.

    Plaintiffs contend that the buffer zones established by the Forest Service are inadequate

in that a number of mining plans will operate in RHCAs within 25 feet or less of an adjacent

stream.[7]  AR 08113-14; FEIS III-33, Table III-14.  The Forest Service replies that other

measures to minimize effects on water quality were adopted along with the 25-foot buffers, and

that moving buffers further out than 25 feet would affect a prohibition on mining.  Whether this

is so does not relieve the Forest Service of its obligation to analyze the impact of mining with a

buffer of 25 feet or less in RHCAs, which is the buffer width proposed by the miners in their

PoOs.  The FEIS echos comments by the Environmental Protection Agency that 25-foot buffers

would not reduce long-term impacts from sediment into streams.  See AR 08374 (EPA

comments that 25-foot buffers and silt fences seems geared to reduce only short term impacts

from sediments); AR 08109 (Forest Service's analysis of submitted PoOs as not including

_____

    [7]For operations not in RHCAs, the Forest Service explains that ten feet is the minimum
buffer width requested on most mining operations in the EIS, and twenty-five feet is the standard
buffer for processing.  AR 08374.

adequate and consistent mitigation measures to protect long-term site productivity and minimize

sediment).  The Forest Service argues that plaintiffs' misapprehend the agency's responsibility,

implying that the Forest Service may simply adopt PoOs without making critical inquiries into

whether operators are taking "all practicable measures" to protect fish and wildlife habitat in

RHCAs.  This court finds that the analysis laid out in the FEIS is inadequate regarding the

selection of buffer width such that the ROD is inconsistent with INFISH standard MM-1 and the

Forest Plan for the WWNF.

        B.     INFISH Standard MM-2

        Plaintiffs argue that the Forest Service did not comply with standard MM-2 and therefore

acted inconsistently with the Forest Plan when it authorized road and settling pond construction

within RHCAs.  Standard MM-2 provides that structures, support facilities, and roads should be

located outside of RHCAs unless no alternative exists, and where no alternative to road

construction exists, such construction must be limited to the minimum necessary for the

approved mineral activity.  AR 02298.  The Forest Service argues that the ROD does not

"locate" any new roads, and that MM-2 does not apply to settling ponds.

        1.     Roads

        The Forest Service admits that "six PoOs envision the possible construction of any roads"

and that roads may be constructed in RHCAs.  Def's memo at 23-24.  Plaintiffs argue that the

record contains no evidence that the Forest Service did the required analysis as to whether

alternatives exist such that roads might be located outside of RHCAs, or that the roads were

limited to the minimum amount necessary as required under MM-2.  The Forest Service makes a

semantic argument that the ROD does not actually "locate" roads in RHCAs, but that some PoOs

propose construction of roads in RHCAs that will be staked on the ground by Forest Service

engineers if no alternative exists at the time the miner seeks to build the road.  This court is not

convinced that the difference between "locating" and "staking" a road cures the defect alleged by

plaintiffs.  If the result will be the same–roads constructed in RHCAs–the Forest Service is

responsible for analyzing the necessity of these new roads, whether alternatives exist, and

providing more specific assurances that new road construction will be limited to the minimum

amount necessary to comply with MM-2.  The Forest Service must provide a more thorough

analysis on the issue of new road construction in RHCAs to satisfy the mandate of MM-2.

2.    Settling Ponds

The Forest Service authorized settling pond construction within RHCAs in seven PoOs.

AR 08100-01.  Plaintiffs argue that the record contains no evidence that the Forest Service did

the required analysis as to whether alternatives existed to locating settling ponds in RHCAs.  The

Forest Service argues that MM-2 applies only to structures, support facilities and roads, and that

settling ponds are none of these such that MM-2 does not apply to the location of settling ponds.

The Forest Service relies on a standard form that applicants submit with PoOs for its argument

that a settlement pond is a "surface disturbance" rather than a structure or facility, and further

argues that the agency's interpretation of its own regulations is entitled to substantial deference.

See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).

As an initial matter, the court notes that the form in question is not an agency regulation

or a rule that is entitled to deference.  An agency's rule must be subject to notice and comment

and be codified in the Code of Federal Regulations (CFR) to have the effect of law.  Western

Radio Services, Inc. v. Espy, 79 F.3d 896, 901 (9th Cir.), cert. denied, 519 U.S. 822 (1996).  In its

Page 16 - OPINION AND ORDER

reply brief, the Forest Service explains that it is not arguing that the form is a regulation, but that

the INFISH provisions incorporated into the Forest Plan "are to be treated as regulations for

deference purposes."  Def's Reply at 18, citing Friends of the Southeast's Future v. Morrison, 153

F.3d 1059, 1069 (9th Cir. 1998).  However, in Morrison, the court found that while the Forest

Service's interpretation of its own regulation is entitled to substantial deference, that

interpretation "does not control where . . . it is plainly inconsistent with the regulation at issue."

Id. at 1069.  But the court's logic from Morrison is not persuasive here as this is not a case of an

agency's interpretation not conforming with regulations, but rather inconsistent interpretations by

an agency make the interpretation forwarded in the instant case less credible.

     Here, plaintiffs point to other Forest Service interpretations of settling ponds as

"structures" or "support facilities" that call into question the Forest Service's argument in this

case.  See U.S. v. Mead, 533 U.S. 218, 228 (2001) (explaining that agency inconsistency is an

indication of unpersuasiveness); see also Young v. Reno, 114 F.3d 879, 883 (9th Cir. 1997)

(ascribing considerably less deference to an agency interpretation which conflicts with that same

agency's earlier interpretation rather than a consistently held agency view) (citation omitted).

     The NFBR ROD discusses settling ponds as being "constructed" or "built."[8]  AR 07947,

08048.  Also, the descriptions of settling ponds as structures in other Forest Service documents is

entitled to some weight even though those documents do not construe settling ponds in the

context of INFISH.  Based on those descriptions of settling ponds, this court finds  that the

settling ponds in this case are subject to INFISH standard MM-2.  The Forest Service must

---

[8]The court notes plaintiffs' arguments in their reply brief as to the placement of other
facilities structures within RHCAs.  Plaintiff's Reply at 40.  Because these arguments appear for
the first time in plaintiffs' Reply, these claims are waived.

perform the required analysis under MM-2 as to whether alternatives exist to locating settling

ponds in RHCAs.

      C.      Forest Plan Open-Road Density Standards

      Plaintiffs argue that the Forest Service's authorized mining plans fail to comply with the

open-road density standards of the WWNF Forest Plan.  This open-road density guideline

provides that the Forest Service must "[m]eet the specific open-road density guidelines found in

the direction for individual management areas unless a specific exception is determined, through

the Forest Service NEPA process, to be needed to meet management objectives."  AR 00227.

The Forest Service points out that prior to the ROD, the open-road density for all the

subwatersheds in the project area exceeded the Forest Plan guidelines.  AR 08075; FEIS II-57.

      The Forest Service argues that it has complied with the open-road density provisions of

the Forest Plan in that road closures and decommissionings will decrease open-road density in

one of the management areas, and that the agency has complied with its responsibility under

NEPA and found an exception to the guideline was necessary to meet the management

objectives of providing access for miners and others.  In the ROD, the Forest Service notes that

mining plans will exceed road densities "due to mining and private property access needs,

administrative use and needs of other forest users."  AR 07951.  However, the ROD and the

FEIS do not present an analysis of whether these are the specific management objectives that

warranted exceptions from open-road density guidelines.

      To the extent that the Forest Service relies on the speculative road closures and

decommissionings addressed above, this court is not persuaded the Forest Service has made a

proper finding regarding open-road density in the project area.  Also, the Forest Service has

failed to make a determination that the plans at issue necessarily warrant a specific exception

from the Forest Plan's open-road density guideline to achieve management objectives.  While the

Forest Service argues that it is not required to make more "formal findings" on this issue, this

court disagrees because without more analysis, a reviewing court will not have a basis for

rational review.  See Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Auto Ins. Co.,

463 U.S. 29, 43 (1983) (requiring a "satisfactory explanation" for an agency action).  Because

the Forest Service failed to clearly identify and discuss management objectives that require

exceptions to the open-road density guidelines, this court finds that the ROD is not consistent

with the Forest Plan.

For the foregoing reasons, plaintiffs' motion for summary judgment on claims under

NFMA are granted.

IV.    The National Environmental Policy Act (NEPA)

Under NEPA, the Forest Service must prepare an environmental impact statement (EIS)

on the environmental effects of and alternatives to proposed major federal actions significantly

affecting the quality of the human environment.  42 U.S.C. § 4332(2)(C).  An EIS must consider

direct, indirect, and cumulative impacts of the proposed action.  40 C.F.R. § 1502.16, 1508.8,

1508.25(c).  NEPA applies to the evaluation by the Forest Service of the proposed plans of

operations (PoO) for mining activities in national forests.  Cady v. Morton, 527 F.2d 786, 796

(9th Cir. 1975).  Depending on the environmental impacts in a proposed PoO, the Forest Service

may be required to prepare an EIA.  36 C.F.R. § 228.4(f).

Plaintiffs argue that the Forest Service violated NEPA by considering forty-nine

proposals together and, thus, failing to analyze site-specific impacts from each mining operation,

and also by failing to consider an adequate range of alternatives to each of the proposed mining operations.  This court disagrees.  The NFBR FEIS is not a programmatic EIS and does not suffer from the same flaws that courts have found when analyzing programmatic as opposed to site-specific EISs.  See California v. Block, 690 F.2d 753 (9th Cir. 1982); Natural Resources Defense Council v. Morton, 388 F. Supp. 829 (D.D.C. 1974).  Also, different agency actions may be analyzed in a single EIS when these actions are sufficiently related and in a similar geographic location.  Inland Empire Public Lands Council v. U.S. Forest Service, 88 F.3d 754, 763-64 (9th Cir. 1996) (utilizing one EIS to analyze eight timber sales in a watershed).  Regulations authorize agencies to consider similar actions in a single document and encourages them to do so when one EIS will provide superior analysis in assessing the combined impacts of similar actions.  40 C.F.R. § 1508.25(a)(3).  Even the purpose and need for the project describes related actions (mining) with cumulative impacts that need to be addressed in concert on a watershed level.  AR 7936; ROD at 1.  NEPA does not require an agency to analyze every proposed event and provide a specific alternative to each.  The Forest Service has provided an adequate level of detail in the summaries laid out in the FEIS.  See AR 06526-06807.  The FEIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences."  Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (citation omitted).  For the foregoing reasons, the Forest Service's motion for summary judgment on claims under NEPA should be granted.

///

///

///

Page 20 - OPINION AND ORDER

///

///

///

///


CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment (# 35) is granted as to the claims under the Clean Water Act, the Organic Act, and the National Forest Management Act.  Defendant's motion for summary judgment (# 50) is granted as to the claims under the National Environmental Policy Act.  The Forest Service is enjoined from allowing mining or mineral operations in the North Fork Burnt River pursuant to the NFBR Record of Decision and Final Environmental Impact Statement issued in April 2004 for any action that this court has found violates the CWA, the Organic Act, NFMA and the implementing laws and regulations of those acts.


Dated this 4th day of August, 2006.


_____/s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge